

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-15-00352-CV

In the Interest of **A.M.Y.**, R.C.M., and E.J.M.Y., Children

From the 150th Judicial District Court, Bexar County, Texas
Trial Court No. 2014-PA-01855
Honorable Charles E. Montemayor, Judge Presiding

Opinion by:    Karen Angelini, Justice

Sitting:    Karen Angelini, Justice
Patricia O. Alvarez, Justice
Jason Pulliam, Justice

Delivered and Filed: October 21, 2015

AFFIRMED

Mary appeals from an order terminating her parental rights to her children, A.M.Y.,

R.C.M., and E.J.M.Y. Frank appeals from an order terminating his parental rights to his child,

E.J.M.Y. In separate briefs, Mary and Frank[1] argue the evidence was legally and factually

insufficient to support the trial court's findings that termination of their parental rights was in the

children's best interest. We affirm.

---

[1]To protect the identity of the children we refer to the parents by fictitious names. *See* TEX. FAM. CODE ANN. § 109.002
(d) (West 2014); TEX. R. APP. P. 9.8(b)(2).

## BACKGROUND

Mary and Frank have one child together, E.J.M.Y. Mary has two additional children, A.M.Y. and R.C.M., who have different fathers. A.M.Y. and R.C.M.'s fathers were parties to the trial court proceedings but they did not appeal.

When the Department first became involved with this family, A.M.Y. was four years old, R.C.M. was one year old, and E.J.M.Y. was not born. After working with Mary and Frank for about a year, the Texas Department of Family and Protective Services filed an original petition for protection of the children and sought temporary conservatorship. By this time, E.J.M.Y. had been born, but was still only an infant. According to the affidavit filed in support of the petition, the Department's main concerns were that the children were living in unsanitary conditions, Frank was using cocaine, and Mary and Frank were engaging in domestic violence. Another concern was that Mary, who was supposed to be supervising Frank's interaction with the three young children, was failing to do so. The trial court ordered the children removed from the home. After an adversarial hearing, the Department was appointed temporary managing conservator of the children. R.C.M. was placed in the home of her paternal grandmother. A.M.Y. and E.J.M.Y. were placed in a foster home.

The Department's initial goal was to reunify the family. Amended service plans were prepared for Mary and Frank, and they were informed of their plans. Later, however, the Department's goal shifted to termination. Nine months after the Department filed its petition, the case was tried to the court.

At trial, the Department called two witnesses. The first witness was a caseworker, Crystal Tipton. Tipton testified that A.M.Y. was now six years old, R.C.M. was three years old, and E.J.M.Y. was one year old. The Department had been involved with the family for about a year before removing the children. Removal was triggered by the unsanitary conditions of Mary and

Frank's home, domestic violence between Mary and Frank, and Frank's continued substance abuse. The substance Frank abused was cocaine. When the children were removed, another caseworker informed Mary and Frank that if they failed to complete their service plans, the Department would not recommend the children's return. Tipton discussed the domestic violence issues with Mary and Frank. Mary denied any domestic violence between her and Frank. On the other hand, Frank acknowledged the domestic violence, telling Tipton that he was afraid of Mary. Tipton was of the opinion that Mary was the perpetrator of the domestic violence and Frank was the victim.

Tipton was aware of two domestic violence incidents that occurred after the children's removal. About two months before trial, Mary and Frank had an altercation. Frank, who received disability benefits for mental health issues, reported to Tipton that Mary had beat him up and "put him out" for his money. Another domestic violence incident occurred about a month before trial. This altercation was inadvertently recorded as a voice message on Tipton's phone and she listened to it. Mary and Frank were arguing about Mary not giving Frank his money, and Frank was calling her obscenities. It was apparent from the recording that the altercation was physical, and Tipton said if the children had heard it, it would have been "concerning."

Just three weeks before trial, Frank tested positive for cocaine. Frank admitted to Tipton that he had used cocaine.

By the time of trial, Frank had completed some, but not all, of the items on his service plan. Frank had completed a domestic violence course, several parenting courses, and an anger management course. However, because of the new domestic violence incidents, Frank was in the process of taking the domestic violence course for a second time. Frank had completed a drug assessment, and was ordered to participate in outpatient services and individual counseling. Frank was engaged in these services at the time of trial. Similarly, Mary had not completed all of the

items on her service plan. Mary had completed several parenting courses, an anger management course, and a domestic violence course. Again, because of the new domestic violence incidents, Mary was in the process of taking the domestic violence course for a second time.

Mary and Frank attended weekly supervised visits with the children. Tipton observed these visits and stated they were appropriate, for the most part. According to Tipton, Mary tended to take on the roles of both parents; while Frank was not actively engaged. On one occasion, Mary had made a comment that she was doing the best she could during visits, but it was difficult because there were multiple children and Frank did not really get involved. There were also concerns that the oldest child, A.M.Y., was taking on a parental role during these visits. Tipton had observed instances in which Frank would tell A.M.Y. to go get E.J.M.Y., instead of going to E.J.M.Y. and redirecting the child himself. Tipton had told Frank that he needed to be more engaged during visits.

Tipton had recently visited Mary and Frank's home and it continued to be an unsanitary place for children to live. Four dogs were in the house, but Mary and Frank had not provided Tipton with vaccination records for the animals. At the beginning of the case, Mary and Frank had told a caseworker that they were going to get rid of the dogs, but they had not done so. As was the case when the Department first became involved with the family, the dishes were not washed, and pots, pans, and food were scattered all over the house. The floors were filthy. There were no sheets on the beds.

Tipton believed that Mary and Frank were still involved in a relationship. In fact, Mary admitted to Tipton that she was still involved in a relationship with Frank. The Department was concerned about Mary's decision to continue her relationship with Frank. Mary was aware that Frank still had a substance abuse problem.

As to the Department's plans for the children, R.C.M. was living in a home with her father and her paternal grandmother. The Department was recommending that R.C.M.'s father and grandmother be appointed joint managing conservators of R.C.M. The other children, A.M.Y. and E.J.M.Y., were living in a foster home together. The Department had studied one of the children's relatives for a potential placement, but it did not work out. The long-term plan for A.M.Y. and E.J.M.Y. was either a relative placement or adoption by a non-relative. A.M.Y. and E.J.M.Y.'s current foster mother was interested in adopting both children. The foster mother had also expressed a willingness to work with R.C.M.'s father to ensure that A.M.Y. and E.J.M.Y. have an ongoing relationship with R.C.M. Finally, A.M.Y. was "very verbal" about wanting to stay in her current placement and she identified her foster mother as her mother.

Tipton believed that termination of Frank's parental rights was in E.J.M.Y.'s best interest because Frank continued to abuse cocaine and to be involved in domestic violence. Tipton acknowledged that Frank had made positive changes. Specifically, Frank was engaged in individual therapy, and a therapist had noticed positive changes. Tipton stated that at the beginning of the case, Frank was very quiet and not really engaged; she acknowledged that he had become more vocal and assertive. However, Tipton did not believe that these changes were significant enough to overcome Frank's other problems. The substance abuse and the ongoing domestic violence with Mary still presented harm to the children.

Tipton also believed that termination of Mary's parental rights was in the best interest of all of the children because Mary continued to be involved in a relationship with Frank knowing that he had a substance abuse problem, Mary continued to engage in domestic violence with Frank, and Mary did not complete every item on her service plan.

The second witness called by the Department was Frank. In his testimony, Frank admitted that he had used cocaine twice since the children's removal. The first time was about six months

before trial, around the time of his birthday. The second time was about three weeks before trial. Frank denied that he had been using cocaine throughout the whole case. Frank agreed that it was not smart to use cocaine and that using cocaine around children can be harmful.

Frank further testified that he and Mary were married the year before. However, one or two months ago, Mary kicked him out of her home, and he was now living with his mother. Frank denied that he and Mary were in a relationship at the time of trial. Frank said that he and Mary talked but that was all; they were not "together." After testing positive for cocaine three weeks before trial, Frank started a new drug treatment program, but admitted that in the span of only a few weeks he had missed three of his drug treatment appointments.

The trial court found by clear and convincing evidence that Mary failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain return of her children. *See* TEX. FAM. CODE ANN. § 161.001(1)(O) (West 2014). The trial court also found by clear and convincing evidence that Frank (1) failed to comply with the provisions of a court order that specifically established the actions necessary for him to obtain return of his child, and (2) used a controlled substance in a manner that that endangered the health and safety of the child and failed to complete a court-ordered substance abuse treatment program or after completion of a court-ordered substance abuse treatment program continued to abuse a controlled substance. *See id.* § 161.001(1)(O), (P). The trial court further found by clear and convincing evidence that termination of Mary and Frank's parental rights was in the best interest of the children. *See id.* § 161.001(2). Mary and Frank appealed.

### APPLICABLE LAW

Termination of parental rights requires proof by clear and convincing evidence that the parent committed one of the acts or omissions listed in section 161.001(1)(A)-(T) of the Texas Family Code and that termination is in the child's best interest. TEX. FAM. CODE ANN.

§ 161.001(1), (2); *In the Interest of A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). Clear and convincing evidence means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. TEX. FAM. CODE ANN. § 101.007 (West 2014).

There is a strong presumption that the child's best interest is served by keeping a child with the parent. *In the Interest of R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). However, in analyzing the factors relevant to the child's best interest we also adhere to the principle that "the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." TEX. FAM. CODE ANN. § 263.307(a) (West 2014). The Texas Family Code lists factors courts should consider in determining whether parents are willing and able to provide the child with a safe environment. *Id.* § 263.307(b). Among the listed factors are the child's age and physical and mental vulnerabilities; a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; a history of substance abuse by the child's family or others who have access to the child's home; the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; and whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with guidance and supervision consistent with the child's safety, a safe physical home environment, and protection from repeated exposure to violence even though the violence may not be directed at the child. *Id*. § 263.307 (b)(1),(7),(8),(10),(11),(12)(C-E).

In evaluating the best interest of the child, courts also consider the factors articulated in *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). The *Holley* factors include: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the

emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Id.*

There is no requirement that evidence be presented as to each of the *Holley* factors. *In the Interest of C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). "The absence of evidence about some of these considerations would not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child." *Id.*

The same evidence proving acts or omissions under section 161.001(1) of the Texas Family Code may be probative of the child's best interest. *Id.* at 28. In analyzing the best interest of the child, we may consider direct and circumstantial evidence, subjective factors, and the totality of the evidence. *In the Interest of E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied).

### STANDARDS OF REVIEW

In reviewing the legal sufficiency of the evidence in a parental termination case, we consider all of the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a strong belief or conviction that its finding was true. *In the Interest of J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. *Id.* If we conclude that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then we must conclude the evidence is legally insufficient. *Id.*

In a factual sufficiency review, we give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing. *Id*. We must consider whether disputed evidence is such that a reasonable factfinder could not have resolved that evidence in favor of its finding. *Id*. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id*.

## DISCUSSION

Both Mary and Frank argue the evidence was legally and factually insufficient to support the trial court's finding that termination of their parental rights was in the best interest of their children.

A factfinder can give great weight to drug-related conduct. *In the Interest of K.C.*, 219 S.W.3d 924, 927 (Tex. App.—Dallas 2007, no pet.). Evidence of a parent's drug use and his or her inability to modify drug-related conduct supports a finding that termination is in a child's best interest. *In the Interest of M.R.*, 243 S.W.3d 807, 820 (Tex. App.—Fort Worth 2007, no pet.). Additionally, exposure to domestic violence supports a finding that termination of parental rights is in the child's best interest. *Id*.; *In the Interest of J.I.T.P.*, 99 S.W.3d 841, 846 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

We first consider the relevant factors listed in section 263.307. The children in this case were all very young—ages six, three, and one—and therefore they were particularly vulnerable. *See* TEX. FAM. CODE ANN. § 263.307(b)(1). The evidence showed that Mary and Frank exhibited an unwillingness and an inability to effect positive environmental and personal changes within a reasonable period of time. *See id*. § 263.307(b)(11). The Department had been involved with Mary and Frank's family for about two years. The children had been removed from Mary and Frank's home for about nine months. Nevertheless, Mary and Frank continued to engage in domestic

violence, even after each of them had completed a domestic violence course. Frank was unable to stop using cocaine, and Mary was aware that Frank continued to use cocaine, but was unable to distance herself from Frank. Repeated exposure to violence, even if the violence is not directed at the children, undermines the safety of the home environment. *See id.* 263.307(b)(12)(E). Furthermore, the unsanitary conditions of the family household had not been remedied during the pendency of this case. In sum, the evidence supports a finding that Mary and Frank could not provide the children with a safe environment, which is critical to a determination of the child's best interest. *See id.* § 263.307(a) (stating that the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest).

We next consider the evidence as it relates to the pertinent *Holley* factors. First, as to the desires of the children, only one child, A.M.Y., was old enough to express her desires. A.M.Y. said that she wanted to remain in the foster home where she currently lived with her sibling, E.J.M.Y. Second, as to the physical and emotional danger to the children now and in the future, the evidence showed continued drug use and domestic violence. *See J.I.T.P.*, 99 S.W.3d at 846 (acknowledging that even though the child was not the intended victim, domestic violence between parents was evidence of physical and emotional danger to the child). Third, as to parental abilities, the evidence showed that Mary and Frank had weekly supervised visits with the children. Both Mary and Frank attended all of the visits, and the caseworker noted that the visits were appropriate, for the most part. However, the caseworker testified that Frank was not fully engaged with E.J.M.Y., and the caseworker told Frank that he needed to take a more active role. Fourth, as to acts or omissions by the parents and any excuses for these acts or omissions, the evidence showed that Frank continued to use cocaine, and Mary remained in a relationship with Frank while he continued to use cocaine. Additionally, Mary and Frank continued engaging in domestic violence, and failed to make their home sanitary. In his testimony, Frank admitted that his use of cocaine

was not a smart decision, agreed that using cocaine around the children was harmful, and described his decision to use cocaine three weeks before the trial as a "mistake." Frank also testified that he moved out of Mary's house one to two months before trial, and was currently living with his mother. Frank indicated that he and Mary were no longer involved in a relationship. On the other hand, the caseworker said that Mary admitted to her that she and Frank were still involved in a relationship, and the caseworker believed that they were. Finally, the caseworker testified about the Department's plans for the children. The Department's long-term plan for R.C.M. was for her to continue to live with her father and her paternal grandmother; its long-term plan for A.M.Y. and E.J.M.Y. was either a relative placement or adoption by a non-relative. A.M.Y. and E.J.M.Y.'s foster mother was interested in adopting both children.

Viewed in the light most favorable to the trial court's ruling, the evidence in this case showed that Frank had a longstanding substance abuse problem. Frank was using cocaine before the children were removed from the home, and continued to use cocaine after the children were removed from the home. Although Mary was aware of Frank's cocaine use, she continued to have a relationship with him. In addition, Mary and Frank engaged in domestic violence and continued to do so, even after they had completed a course to help them modify their volatile behavior. Neither Mary nor Frank had completed their respective service plans, even though they had been informed that the Department would not recommend reunification with the children unless they had completed their plans. The only controverting evidence was from Frank, who claimed that his cocaine use was sporadic, that he and Mary were no longer in a relationship, and that he and Mary had stopped living together a month or two before trial. However, this evidence was not such that a reasonable factfinder could not have resolved it in favor of a finding that termination was in the children's best interest.

Considering the evidence under the appropriate standards of review, we conclude that the trial court could have formed a firm belief or conviction that terminating Frank's parental rights was in the best interest of E.J.M.Y., and could have formed a firm belief or conviction that terminating Mary's parental rights was in the best interest of A.M.Y., R.C.M., and E.J.M.Y.

## CONCLUSION

The trial court's termination order is affirmed.

Karen Angelini, Justice